**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 15-24560-CIV-ALTONAGA/O'Sullivan**

**IN RE APPLICATION OF DEPARTMENT OF HOMELAND SECURITY, IMMIGRATION AND CUSTOMS ENFORCEMENT**,

Petitioner,

vs.

**ANWAR HOSSAIN**, *et al.*,

Respondents.
_______________________________/

# ORDER

**THIS CAUSE** came before the Court for a hearing [ECF No. 12] on December 21, 2015, regarding Petitioner, the Department of Homeland Security, Immigration and Customs Enforcement's ("ICE['s]") Petition for Emergency Court Order to Permit Involuntary Blood Draws, Urinalysis, Conduct Weigh-In's, and Perform Routine Medical Examinations ("Petition") [ECF No. 1] and Emergency Motion . . . ("Motion") [ECF No. 4], both filed December 11, 2015. ICE seeks permission to monitor the health of the ten Respondents,[1] citizens of Bangladesh who have been engaging in a hunger strike while in detention at the Krome Service Processing Center ("Krome") in Miami, Florida. (*See* Mot. 1–2). Seven of the Respondents have final orders of removal to Bangladesh. The Respondents appear to be hunger-striking in protest of their removal, as well as dissatisfaction with their continued detention.

The Court granted the Motion on December 14, 2015 (*see* Order [ECF No. 7]), allowing ICE to conduct involuntary medical examinations of the Respondents for the purpose of assessing

[1] Respondents are Anwar Hossain, Mohammed Islam, Abdul Wadud-Khan, MD Osman Shohag, Monir Hossain, MD Abdul Owayid, Mohammed Anam, Abdul Awal, Abdul Kader Helal, and Mahmudal Hasan (collectively, "Respondents").

the state of each Respondent's health to determine whether further medical intervention is necessary. (*See id.* 2). The Court also set the matter for an evidentiary hearing on December 21, 2015. (*See id.*).

## I. DECEMBER 21 HEARING

ICE officials and all Respondents were present at the December 21 hearing. A Bengali interpreter was also present to translate the proceedings for the Respondents. Shortly before the hearing, ICE filed a Status Report [ECF No. 11] indicating three of the Respondents, Anwar Hossain, Mohammed Islam, and Mohammed Anam, had resumed eating and were no longer on hunger-strike monitoring. (*See id.* 1). At the hearing, ICE advised that Respondent, Abdul Kader-Helal, consumed a meal on December 20, 2015, but had declined a morning meal on December 21, 2015. ICE explained it was seeking an order permitting involuntary administration of nutrients to the seven remaining hunger strikers ("the Striking Respondents"),[2] since they are rapidly approaching permanent organ damage or death.

Dr. Dalian Y. Caraballo ("Dr. Caraballo"), a staff physician at Krome's Medical Housing Unit, is providing Respondents with medical care. She testified the Striking Respondents have been on a hunger strike since December 2, 2015. Dr. Caraballo explained the human body's response when it is deprived of any nutrition. During the first three days of a hunger strike, the body's glucose supply is consumed. The body next begins using fat for energy, and then muscle tissue.

She testified when a hunger-striking individual's weight loss approaches 18 percent of his body weight, permanent damage to body organs can occur. Dr. Caraballo identified the loss in body weight of the Striking Respondents: Abdul Wadud-Khan (15%); MD Osman Shohag

[2] The Striking Respondents are: Abdul Wadud-Khan, MD Osman Shohag, Monir Hossain, MD Abdul Owayid, Abdul Awal, Abdul Kader Helal, and Mahmudal Hasan.

(13.5%); Monir Hossain (11%); MD Abdul Owayid (15%); Abdul Awal (12.5%); Abdul Kader Helal (15%); and Mahmudal Hasan (11%).

In Dr. Caraballo's opinion, the Striking Respondents are fast-approaching the point where involuntary administration of nutrients will be medically necessary to prevent permanent organ damage and death. The involuntary administration of nutrients is accomplished through a nasogastric tube, a procedure that can cause some discomfort. Another method is an intravenous line, where a needle is inserted into the patient's vein. Dr. Caraballo testified the nasogastric tube more closely approximates normal feeding and is thus a healthier method of compelled nutrition. Further, nasogastric feeding is the only procedure that can be performed at Krome.[3]

Joel T. Mikelson ("Mr. Mikelson"), the Assistant Field Office Director at Krome, is essentially the warden at Krome. He has worked there since December 2013. Mr. Mikelson has been employed by ICE, and its predecessor, the Immigration and Naturalization Service, since January 1995. His responsibilities as the Assistant Field Office Director include ensuring the safety and security of the facility and the welfare of the detainees and staff at Krome. The detainees housed at Krome are in removal proceedings under the Immigration and Nationality Act. There is an Immigration Court located at Krome, and hearings are held at the facility.

Mr. Mikelson testified a hunger strike by detainees presents several issues. First, ICE has a duty to preserve the lives and protect the well-being of detainees in its custody. Second, a hunger strike, and the reaction by ICE to the hunger strike, can affect the morale and good order of the facility. If nothing is done to prevent a hunger-striking detainee from starving to death, other detainees may perceive the staff does not care about the welfare of the detainee population. This perception may cause detainees to lose trust in the staff. Additionally, this loss of trust may cause

[3] Dr. Caraballo stated intravenous feeding would require transporting Respondents to a hospital outside of Krome.

disruptions in the good order of the facility, such as by detainees refusing to proceed to the dining hall for meals.

According to Mr. Mikelson, Respondents have access to telephones and can call whomever they wish, including news media outlets. Respondents have access to the mail, where they can send letters to whomever they wish. Also, if a detainee wishes to be interviewed by a media representative, a request may be sent to the ICE Field Operations Director for approval. In Mr. Mikelson's experience, these requests are routinely granted.

The Court inquired, through the Bengali interpreter, whether any of the Respondents had failed to understand the proceedings, to which no one answered affirmatively. The Court also permitted Respondents to directly question Dr. Caraballo and Mr. Mikelson during their testimony. The Respondents primarily questioned Dr. Caraballo regarding their individual medical situations, and asked how and for how long the compelled feeding would occur. Finally, the Court allowed the Respondents to make additional statements, if they so desired. Respondent, Monir Hossain, stated Respondents would stop striking if ICE grants their demands, which he described as "relief from the detention center." Mr. Hossain further complained of bad food quality and sleep disturbances (although none between the hours of 12:00–5:00 a.m.) at Krome. Respondent, MD Abdul Owayid, stated, "We are willing to die."

## II. LEGAL STANDARDS

In order to obtain a preliminary injunction, a party must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (citation omitted); *see also Levi*

*Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F. 3d 982, 985 (11th Cir. 1995).

In the context of compulsory feeding, courts also balance a detainee's constitutional right to bodily integrity and First Amendment freedom of expression against the detention center's interests in preserving life and maintaining prison security. *See generally In re Soliman*, 134 F. Supp. 2d 1238 (N.D. Ala. 2001). A prison regulation that infringes an inmate's constitutional rights is an actionable constitutional violation, only if the regulation is unreasonable. *See Hakim v. Hicks*, 223 F.3d 1244, 1247 (11th Cir. 2000) (footnote call number omitted) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). The *Turner* Court identified several factors in the reasonableness inquiry: "(1) whether there is a 'valid, rational connection' between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an 'exaggerated response' to prison concerns." *Pope v. Hightower*, 101 F.3d 1382, 1384 (11th Cir. 1996) (citing *Turner*, 482 U.S. at 89–91).

## III. ANALYSIS

Given Dr. Caraballo's and Mr. Mikelson's testimony, as well as their previously submitted declarations (*see* Declaration of Dalian Y. Caraballo, M.D. [ECF No. 1-3]; Declaration of Joel T. Mikelson . . . [ECF No. 1-4]), the Court finds ICE has satisfied its burden in showing a preliminary injunction is warranted. Without a preliminary injunction allowing ICE to administer nutrients to the Striking Respondents, irreparable injury will result, as the Striking Respondents will experience permanent organ damage or death. This threatened injury, as well as the security burdens imposed on Krome by Respondents' hunger strike, outweigh the harm the injunctive relief

may inflict on the Striking Respondents. Entry of a preliminary injunction will serve the public interest in that it will preserve human life and maintain security and order at Krome.

ICE has shown a valid, rational connection between compulsory medical examinations and force-feeding the Striking Respondents and ICE's interests in (1) keeping the Striking Respondents alive and in good health; and (2) maintaining order and security at Krome. *See Dep't of Homeland Sec. v. Ayvazian*, No. 15-23213-Civ-Scola, 2015 WL 5315206, at *4 (S.D. Fla. Sept. 11, 2015). As Respondents' custodian, ICE has a legal duty to provide for Respondents' health and well-being. The preservation of Respondents' lives is also necessary to maintain security and good order at Krome. Detainees must trust and believe the detention staff and Public Health Service medical staff will not allow them to starve themselves to death.

There are other means available for Respondents to exercise their First Amendment rights. *See In Re Soliman*, 134 F. Supp. 2d at 1253 (finding, "the court must determine whether alternative means of exercising First Amendment rights to free expression remain open [to the prisoner]" (alteration added)), *vacated on grounds of mootness*, *Soliman v. United States*, 296 F.3d 1237 (11th Cir. 2002). Respondents have access to telephones and the mail, so they can contact the media if they wish.

During the hearing, Mahmudal Hasan remarked that ICE deprived Respondents of access to a telephone during their hunger strike. The following day, Mr. Mikelson filed a Supplemental Declaration . . . [ECF No. 13] explaining he has implemented a procedure through which Respondents will have daily access to the phones: "A detainee wishing to make a telephone call, who is housed in the Medical Housing Unit and too weak to walk by himself, will be taken by wheelchair to the phones, by a nurse and a contract security officer . . . . This will occur on a daily basis, at 1:00 p.m." (*Id.* at ¶ 3 (alteration added)).

ICE's request for an order permitting the involuntary administration of nutrients is not an exaggerated response to a prison concern — the Respondents' hunger strike. *See Ayvazian*, 2015 WL 5315206, at *4; *see also In Re Soliman*, 134 F. Supp. 2d at 1254. At least one Respondent indicated he is willing to die, and another stated Respondents will keep hunger-striking until ICE gives into their demands. But Respondents cannot force ICE to accede to their demands through a hunger strike. Respondents leave ICE with two options: allowing Respondents to die or forcibly administering nutrients. The latter option is a more reasonable and humane response to Respondents' strike.

Respondents are urged to end their hunger strikes before compelled nutrition becomes necessary. Continuing the strikes will only endanger their health and well-being. If Respondents desire to protest their cases further, they are encouraged to use the other means at their disposal, such as making telephone calls or writing letters to the media.

## IV. CONCLUSION

Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1. ICE's Petition for Emergency Court Order . . . **[ECF No. 1]**, permitting the involuntary administration of nutrients to the Striking Respondents, Abdul Wadud-Khan, MD Osman Shohag, Monir Hossain, MD Abdul Owayid, Abdul Awal, Abdul Kader Helal, and Mahmudal Hasan, is **GRANTED**, subject to the following restrictions:

    a. ICE may not begin involuntarily administering nutrients to Striking Respondents until it becomes medically necessary to do so to prevent death or organ failure, i.e., when an individual Striking Respondent's weight loss reaches 18 to 20 percent of his body weight.

b. When that critical period occurs, ICE may, through competent medical authority, involuntarily administer nutrients to the relevant Striking Respondent via a nasogastric tube or an intravenous line. Anesthesia should be applied, when medically advisable to do so, in the interest of administering nutrients humanely. ICE may also, through competent medical authority, restrain the relevant Striking Respondent during the medical procedure if he attempts to resist.

c. ICE must cease involuntarily administering nutrients when Respondents resume eating and are no longer in immediate risk of organ failure or death.

2. ICE is authorized, through competent medical authority, to monitor the health of the Respondents for as long as they continue the hunger strike, by: involuntarily drawing blood; inserting urinary catheters for the purpose of obtaining urine for urinalysis; and conducting weigh-in's and medical examinations of Respondents. Further, ICE is authorized, through competent medical authority, to restrain Respondents during these medical procedures if they attempt to resist.

3. ICE shall ensure Respondents have access to telephones, mail, and interviews with media, even during their periods of participation in the hunger strike.

4. ICE shall translate this Order into Bengali, and provide it to all Respondents.

5. The Order shall remain in effect until **March 1, 2016**. ICE shall file a Status Report on **December 30, 2015**, and every fourteen days thereafter, so long as any of the Respondents continue the hunger strike.

6. The relief sought in the Petition having been granted in full (*see* Pet. 3-4), the Clerk of Court is instructed to mark this case as **CLOSED**.

**DONE AND ORDERED** in Miami, Florida, this 22nd day of December, 2015.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record;
Anwar Hossain
Mohammed Islam
Abdul Wadud-Khan
MD Osman Shohag
Monir Hossain
MD Abdul Owayid
Mohammed Anam
Abdul Awal
Abdul Kader Helal
Mahmudal Hasan
Krome Service Processing Center
18201 S.W. 12th Street
Miami, Florida 33194